TRINA A. HIGGINS, United States Attorney #7349
SETH NIELSEN, Special Assistant United States Attorney #13823
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-3080

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH AND SEIZURE OF AN APPLE IPHONE IMSI: 311480769974713 BEARING THE PHONE NUMBER 801-520-7138 SEIZED FROM CHELSIE HUGGINS MARINOS AT 3515 S REDWOOD ROAD, WEST VALLEY CITY, UT. | Case No. 2:23mj21 JCB AND 2:23mj22 JCB |
| AND | AFFIDAVIT |
| THE SEARCH AND SEIZURE OF A SAMSUNG SMART WIRELESS PHONE WITH AN IMEI 350799514547945 AND BEARING THE PHONE NUMBER 385-343-0234 BELONGING TO MICHAEL ODOM | **UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Daniel N Garrett, Special Agent for the United States Drug Enforcement

Administration (DEA) being duly sworn, hereby deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—two

electronic devices—which are currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am a sworn Special Agent for the Drug Enforcement Administration (DEA) and have been employed as such since April of 2022.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  I have been assigned to the DEA Metro Narcotics Taskforce (MNTF), Denver Division, Salt Lake City District Office (SLCDO), Utah, as a Special Agent (SA) since July of 2022.  I attended and successfully completed the Basic Agent Training course held in Quantico, Virginia.  At Quantico, I received instruction in the common practices of drug trafficking organizations (DTOs).  I was given examples of common conduct among traffickers and common behaviors exhibited by those trafficking narcotics.  I was instructed in the identification of narcotics of various kinds and methods used to conceal those narcotics from detection.  Prior to attending and graduating from Basic Agent Training, I served as a member of the Metropolitan Nashville Police Department (MNPD).  After graduating in 2015 from the 22-week MNPD academy, I was assigned to patrol division for two years.  I then became a part of a uniformed proactive policing team tasked with reducing gun violence and narcotics crime within the confines of North Precinct.  I then became a street level narcotics detective.  While serving as a detective, I authored and served numerous warrants.  These warrants included search warrants of houses and businesses, cell phone pings, and social media search warrants.

3.      During the course of my employment as a DEA Special Agent and a Metro Nashville Police Officer, I have participated in drug investigations which involved the use of Title-III interceptions, undercover agents, confidential informants, cooperating witnesses, physical surveillance, consensual recordings, drug evidence purchases, toll record analysis, and

2

subject interviews.  Through such investigations and training, I have become familiar with the

patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers,

and the methods, language, and terms that are used to disguise illegal drugs and the dealings

associated with such activities.  I have participated in serving search warrants and surveillance

operations.  In addition, I have training and experience in debriefing defendants, informants, and

other persons who have personal knowledge of spending, converting, transporting, distributing,

laundering, and concealing of proceeds of narcotics trafficking.  I have received special training

in the enforcement of laws concerning controlled substances as found in Title 21, United States

Code.  In connection with my duties and responsibilities as a law enforcement officer, I have

testified in judicial proceedings and prosecutions for violations of laws concerning controlled

substances and other numerous violations of state laws and federal laws.  I am familiar with the

ways in which narcotic traffickers conduct their business, including, but not limited to, their

methods of importing and distributing controlled substances, their use of mobile telephones, and

their use of code words to conduct transactions.

> 4.      This affidavit is intended to show only that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

> 5.      The property to be searched are (1) **an Apple iPhone cellular telephone with
IMEI 359888173493441 belonging to Chelsie HUGGINS-MARINOS** ("**Device 1**") and (2) **a
Samsung cellular telephone with IMEI 350799514547945 belonging to Michael ODOM**
("**Device 2**").  **Device 1** and **Device 2** will be collectively referred to as "the **Devices**." The
**Devices** are currently located at DEA, 2570 West 1700 South, Salt Lake City, UT.

6.     The applied-for warrant would authorize the forensic examination of the **Devices**

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     In early July 2022, agents began investigation a methamphetamine drug

trafficking organization ("DTO") which was bringing pounds of methamphetamine from out-of-

state to the Salt Lake Valley.  Agents identified several members of the DTO, including Cheslie

HUGGINS-MARINOS and Michael ODOM.  Agents identified Caile NOBLE as the leader of

the DTO.

8.     On September 22, 2022, DEA SLCDO agents obtained a court order for the

interception of wire and electronic communications over 801-889-8793, used by NOBLE.  The

intercept order was signed by the Honorable Judge Robert Shelby, U.S. District Judge, District of

Utah, Case No. 2:22sc134.  Agents began interception on September 26, 2022.  The order

expired October 25, 2022.

9.     As soon as interceptions of TT1 began, agents immediately intercepted ODOM

(using **Device 2**) speaking to NOBLE over TT1.  In several calls, ODOM requested drugs from

NOBLE.  On multiple occasions, surveillance agents observed ODOM arrive at NOBLE's

residence at 6513 S. Redwood Rd., Taylorsville, Utah, to obtain drugs.

10.     On October 16, 2022, agents intercepted NOBLE speaking to HUGGINS-

MARINOS (using **Device 1**) and NOBLE asked if HUGGINS-MARINOS had spoken with

"Alex" and told HUGGINS-MARINOS to tell "Alex" NOBLE wanted "the one for 18."

11.     On October 18, 2022, NOBLE "Alex," who agents believe to be NOBLE's source

of supply ("SOS"), that NOBLE needed "64" and the "one for 18."  Agents believe, based on

training and experience, that NOBLE was requesting 64 pounds of methamphetamine and one

kilogram of cocaine for $18,000.  NOBLE discussed further with "Alex" the location from which

NOBLE was supposed to pick up the narcotics.

12.      On October 21, 2022, agents observed, via location data for TT1, that NOBLE

had traveled to the Los Angeles, California, area with Chelsie HUGGINS-MARINOS.  Agents

intercepted, in sessions 2583, 2586, 2592, 2594, 2596, 2601, 2602, and 2606 of TT1, that

NOBLE apparently obtained an address from "Alex" where to meet an unidentified third party to

obtain the drugs, and "Alex" informed NOBLE that it would be "65," which agents believed to

mean 65 pounds of methamphetamine.  NOBLE apparently obtained the drugs, as he told "Alex"

in session 2606 that "everything was good" and that he would return to California "soon" and

would let "Alex" know when.  Agents learned from additional TT1 intercepts that NOBLE paid

$51,200 for the 65 pounds of methamphetamine and $18,000 for the cocaine totaling $69,200.

13.      Agents observed that location data for **Device 1** that NOBLE and HUGGINS-

MARINOS traveled overnight on October 21 into October 22, 2022, from the Los Angeles,

California, area, to Mesquite, Nevada.  NOBLE and HUGGINS-MARINOS apparently turned

off TT1 and **Device 1** mid-morning on October 22, 2022, as agents did not obtain location data

again until approximately 8 PM when NOBLE turned his phone (TT1) back on.  Agents

observed that he was located north of St. George, Utah, and was traveling northbound.  Agents

maintained surveillance along I-15 and located NOBLE's black Jaguar, bearing Utah license

plate 2S1SL, traveling northbound.

14.      Agents arranged to have NOBLE's vehicle stopped by local uniformed law

enforcement near Nephi, Utah.  After the stop a drug detecting canine was deployed and alerted

to the Jaguar.  NOBLE was informed that agents were towing his vehicle, and he was free to

leave.  Officer transported NOBLE to a truck stop in Nephi, Utah, and released him.  Agents

later learned NOBLE and Chelsie HUGGINS-MARINOS had had a verbal argument and

HUGGINS-MARINOS had exited the vehicle sometime before the traffic stop occurred.

15.     Agents obtained a search warrant for the Jaguar, and upon searching, located a

total of 1 kilogram of suspected cocaine and 65 pounds of suspected crystal methamphetamine

inside large black duffle bags in the trunk.  Both the suspected cocaine and suspected

methamphetamine were later tested and both tested positive for their respective substances.

16.     On November 12, 2022, NOBLE was again intercepted speaking with NOBLE's

SOS named "Alex." "Alex" asked if NOBLE had the address for "the 60." NOBLE and "Alex"

communicated multiple times over the next few hours confirming the pickup of "the 60"

(Session 3390) providing the address for the kilogram of cocaine (Session 3432), and confirming

the narcotics transaction was complete (Session 3444).  Shortly after the above conversations,

NOBLE again traveled from Los Angeles, California, to Utah and arrived at his residence, 6513

S. Redwood Rd., Taylorsville, on November 13, 2022, and began making phone calls to his

known distributors and associates, including HUGGINS-MARINOS using **Device 1** and ODOM

using **Device 2**.  On November 13, 2022, before arriving at his residence, NOBLE called John

SHIELDS and told SHIELDS he would be home "within the hour" and asked if SHIELDS

wanted to "go by" NOBLE's residence (Session 3505).  NOBLE also spoke with another person,

stating NOBLE would be "home soon" and would meet with them when NOBLE arrived

(Sessions 3503 and 3513 of TT1).

17.     At approximately 2:55 PM on November 13, 2022, agents observed that

SHIELDS' vehicle was at NOBLE's residence.  Agents had previously identified SHIELDS

based on interceptions and surveillance, and knew SHIELDS drove a silver Nissan SUV, and

that SHIELDS resided at 4107 W. Twilight Drive, Kearns, Utah.  Agents observed SHIELDS

depart NOBLE's residence.  SHIELDS began traveling north on Redwood Road in his silver

Nissan Pathfinder SUV bearing Utah license plate 5T9FF.  SHIELDS then turned west on 6200

South and continued as agents maintained SHIELDS' vehicle under constant and continuous

surveillance.  SHIELDS turned north on 4000 West, then west onto Twilight Drive, as agents

had SHIELDS stopped for a traffic violation.  SHIELDS complied and pulled his vehicle over at

the intersection of Twilight Drive and 4000 West, which is less than ¼ mile from SHIELDS'

residence.

20. 18.     Agents deployed a drug detecting canine on SHIELDS' vehicle, and the canine

alerted on the passenger side of the vehicle.  SHIELDS was detained.  Through the window,

agents could clearly see a vacuum sealed package containing what appeared to be

methamphetamine under the passenger seat.  Agents searched the vehicle and seized the

suspected one pound of crystal methamphetamine from under the seat.  The suspected

methamphetamine later tested positive as methamphetamine.

19.     On November 30, 2022, agents executed a federal search warrant at 6513 S.

Redwood Road, Taylorsville, UT.  Agents obtained the warrant on November 29, 2022, and it

was signed by the Honorable Judge Daphne A. Oberg.  Upon executing the warrant agents

detained Caile NOBLE and Neil REEDY.  Caile NOBLE and Neil REEDY were both located in

the bedroom where approximately four pounds of methamphetamine were located in a cooler.

20.     On December 7, 2022, a probable cause arrest was conducted on Michael ODOM.

ODOM was read his *Miranda* warnings and stated he would speak with agents.  ODOM stated

post-*Miranda* he purchased methamphetamine from NOBLE.  **Device 2** was found on ODOM's

person when he was arrested and **Device 2** was seized by agents at that time.  ODOM had been

intercepted multiple times using **Device 2** to communicate with NOBLE on TT-1.

21.     On December 14, 2022, a Grand Jury Indictment was issued for Chelsie

HUGGINS-MARINOS.  HUGGINS-MARINOS was taken into custody on December 15, 2022,

and read her *Miranda* warnings.  Post-*Miranda* HUGGINS-MARINOS admitted to

communicating with "Alex" and NOBLE using **Device 1.  Device 1** was found on HUGGINS-

MARINOS' person when she was arrested and **Device 1** was seized by agents at that time.

HUGGINS-MARINOS had been intercepted multiple times using **Device 1** to communicate with

NOBLE on TT-1, as well as location data for **Device 1** showed that HUGGINS-MARINOS

traveled with NOBLE to pick up a large quantity of methamphetamine from the Los Angeles,

California, area.

22.     The **Devices** are currently in the possession of the DEA located at 2570 West

1700 South, Salt Lake City, UT.  In my training and experience, I know that the **Devices** has

been stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the Device first came into the possession of law

enforcement.

## TECHNICAL TERMS

23.     Based on my training and experience, modern cellular telephones (smart phones)

have a wide array of capabilities that can encompass numerous other forms of technology. As

such, I believe that the Device is capable of the below functions and I use the following technical

terms to convey the following meanings:

  a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

      telephone) is a handheld wireless device used for voice and data communication

      through radio signals.  These telephones send signals through networks of

      transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet.  An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination.  Most Internet service providers control

a range of IP addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

g.  Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

24.     In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

13

## CONCLUSION

29.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

## REQUEST FOR SEALING

30.     It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the application

and search warrant.  I believe that sealing this document is necessary because the warrant is

relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

investigation will be searched at this time.  Based upon my training and experience, I have

learned that, online criminals actively search for criminal affidavits and search warrants via the

internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them

publicly online through the carding forums.  Premature disclosure of the contents of this affidavit

and related documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

Respectfully submitted,


 /s/ Daniel Garrett
Daniel Garrett
Special Agent
Drug Enforcement Administration (DEA)


Subscribed and sworn to before me
on January 10, 2023:


JARED C. BENNETT
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

1.　　　The property to be searched are (1) **an Apple iPhone cellular telephone with**

**IMEI 359888173493441 belonging to Chelsie HUGGINS-MARINOS** ("**Device 1**") and (2) **a**

**Samsung cellular telephone with IMEI 350799514547945 belonging to Michael ODOM**

("**Device 2**").  **Device 1** and **Device 2** will be collectively referred to as "the **Devices**." The

**Devices** are currently located at DEA, 2570 West 1700 South, Salt Lake City, UT.

This warrant authorizes the forensic examination of the **Devices** for the purpose of

identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of

Title 21 United States Code § 841(a)(1), Distribution and Possession with Intent to Distribute a

Controlled Substance; Title 21 United States Code § 843(b), Unlawful Use of a Communication

Facility; and Title 21 United States Code § 846, Conspiracy to Distribute and Conspiracy to

Possess with Intent to Distribute a Controlled Substance; Title 18 United States Code § 1956(h),

Conspiracy to Commit Money Laundering and involve Caile NOBLE and Neil REEDY

including:

      a.   information and communications documenting drug and money laundering

activities. Communications between coconspirators known and unknown

discussing the drug and money laundering conspiracy which may be documented

in emails, drafts, notes, applications, text messages, and other means of

communication.

      b.   lists of customers and related identifying information;

      c.   types, amounts, and prices of drugs trafficked as well as dates, places, and

amounts of specific transactions;

      d.   any information related to sources of drugs (including names, addresses, phone

numbers, or any other identifying information);

      e.   all bank records, checks, credit card bills, account information, and other financial

records.

2.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history.